Respondent:
Mr. Siu Lim Lee
In Pro Per
Address: 812 Coverdale Ln, Virginia Beach, VA 23452
Phone number: 310-721-4658

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

[Norfolk Division]

| UNITED STATES OF AMERICA,<br><br>  Petitioner,<br><br>v.<br><br>SIU LIM LEE d/b/a MEGA-MUSCLES,<br><br>  Respondent. | Misc No. 2:25-mc-5<br><br>**RESPONDENT'S REPLY TO ORDER TO SHOW CAUSE**<br><br><u>Hearing</u><br>Date: April 24, 2025<br>Time: 10:00<br>Place: Walter E. Hoffman Courthouse, 600 Gamby Street, Norfolk, VA 23510 |
|---|---|

  COMES NOW SIU LIM LEE d/b/a MEGA-MUSCLES ("Respondent") responding to the Court's Order to Show Cause (See **Exhibit "A"**) regarding non-compliance with the Drug Enforcement Administration's ("DEA") administrative subpoena issued pursuant to *21 U.S.C. § 876(a)* (See Exhibit "B"):

I. **INTRODUCTION**

  This case involves the United States Drug Enforcement Agency ("DEA") seeking to find respondent in violation of the criminal laws of the United States as per their subpoena request (See Exhibit "B"). Respondent has not and is not violating any state or federal law in regard to the sale of the product known as "epiandrosterone, 7-keto-dehydroepiandrosterone, or/and 19-nor-dehydroepiandrosterone." The DEA contends this is an illegal substance and an anabolic steroid

or otherwise in violation of federal law. However, this is not based on any scientific or legal evidence, as no independent scientific analysis of products could have been undertaken to confirm any alleged illegal properties, and instead they issued their subpoena (which did not request a chemical breakdown or analysis of the product in question),

This was conveyed earlier to the DEA and its representatives after the subpoena was received, and it was made clear that respondent's position was/is that there is no reasonable basis for this investigation that would support turning over any documents as requested. Moreover, some of the demands for documents (initially requiring an appearance and production in San Francisco where Respondent does not live), were vague, compound, and unrelated to a legitimate investigation, thereby making the request unduly burdensome and improper. This can be seen in their subpoena demands below.

It is common knowledge, for example, that natural path doctors (that do not use illegal substances to help boost energy) recommend products to their clients that are not on the illegal substance list. This is the same situation here. The DEA subpoena fails to request the chemical compound or makeup of the alleged illegal product. **The reason for this is, there is no illegal product, and nothing to base an investigation upon as to Respondent.** Apparently, they have not done so. Instead, they seek to unduly burden Respondent with vague and overbroad subpoena demands. This is not proper, and the burden should not shift until the DEA can establish a legitimate investigation within its authority. It appears Respondent is not really the target of any unlawful conduct.

Moreover, Respondent should have no obligation to comply with a subpoena directing **him to respond in San Francisco, California when he lives in Virginia. This was unreasonable and an unconstitutional due process violation.**

Respondent has not complied with the DEA's administrative subpoena because the subpoena seeks information that Respondent respectfully contends exceeds the statutory authority of the DEA, is not reasonably relevant to a legitimate investigation, is overly broad, and imposes an undue burden. Respondent categorically denies any involvement in the sale or distribution of anabolic steroids or any controlled substances and disputes that the subpoena was issued pursuant to a justified investigation. He is willing to explain exactly what he is marketing, but the subpoena should not withstand scrutiny.

## II. LEGAL STANDARD – POINTS AND AUTHORITIES

### A. Standard for Enforcing Administrative Subpoenas

When a district court is asked to enforce an administrative subpoena, the "court's role is limited to evaluating (1) whether the subpoena was issued for a **lawful purpose** within the statutory authority of the issuing agency; (2) the documents requested are **relevant** to that purpose; and (3) the subpoena demand is **reasonable and not unduly burdensome**." *Winters Ranch P'ship v. Viadero*, 123 F.3d 327, 329 (5th Cir. 1997); *accord United States v. Transocean Deepwater Drilling, Inc.*, 767 F.3d 485, 488 (5th Cir. 2014); *see also United States v. Powell*, 379 U.S. 48, 57-58, 85 S. Ct. 248, 13 L. Ed. 2d 112 (1964) (holding that enforcement of administrative subpoenas requires a showing "that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the [agency's] possession, and that the administrative steps required by the [statute] have been followed"). (emphasis added).

The Government bears the initial burden to show that the criteria have been met, although the burden to make a prima facie case is 'minimal.'" *Transocean*, 767 F.3d at 489 (internal citations omitted); *see also United States v. Tex. Heart Inst.*, 755 F.2d 469, 474 (5th Cir. 1985). Once the

Government has made a prima facie case, the burden of going forward shifts to the party opposing the subpoenas." *Transocean*, 767 F.3d at 489 (internal citations omitted). See *United States v. Zadeh* (N.D.Tex. Jan. 31, 2015, Civil Action No. 4:14-cv-106-O) 2015 U.S.Dist.LEXIS 11538, at *2-3.). However, this burden should not shift without a sound legal basis.

The United States argues in its petition: "In the course of "any investigation relating to his functions under [the CSA] with respect to controlled substances, listed chemicals, tableting machines, or encapsulating machines," the CSA authorizes the Attorney General to issue administrative subpoenas to "compel the attendance and testimony of witnesses, and require the production of any records (including books, papers, documents, and other tangible things which constitute or contain evidence) which the Attorney General finds relevant or material to the investigation."

Section *21 U.S.C. § 876(a)* states:

> "In any investigation relating to his functions under this subchapter with respect to controlled substances, listed chemicals, tableting machines, or encapsulating machines, the Attorney General may subpoena witnesses, compel the attendance and testimony of witnesses, and require the production of any records (including books, papers, documents, and other tangible things **which constitute or contain evidence) which the Attorney General finds relevant or material to the investigation.**" (emphasis added).

The DEA proffers that this is a case dealing with illegal controlled substances. However, there are none at issue here. Case law dictates the lawful limits of a DEA investigation. Summarized herein are some of the key cases relevant to this response.

A. **Allen Hemp Coalition v. U.S. Dept. of Justice, No. 4:24-mc-00110 (E.D. Tex. 2024** (referenced in Complaint in HILTX v. Allen Police Dep't, No. 4:24-cv-944 (E.D. Tex. Oct. 22, 2024)).

The DEA, in conjunction with local police in Allen, Texas, issued administrative subpoenas to nearly all hemp-derived product shops in the area. The subpoenas sought extensive

-4-

records (including financial and customer information) from these businesses as part of an investigation into whether they were selling illegal hemp products.

The hemp retailers (organized as the Allen Hemp Coalition) objected to the subpoenas. They filed a motion to quash in federal court, arguing the DEA was overstepping its authority because the products were lawful hemp not regulated under the Controlled Substances Act. In July 2024, the court ordered the agency to justify their legality. Notably, the DEA never responded with a justification for the subpoenas by the court's deadline. Instead, the DEA withdrew the subpoenas entirely in November 2024, effectively mooting the dispute. This result implies that the court viewed the DEA's investigation as exceeding its statutory authority (since hemp that meets federal definitions is not a controlled substance), rendering the subpoenas unnecessary and unenforceable in this context. This is the same case here, where Respondent is not utilizing or importing any illegal substances.

The court noted: Under the "reasonable relevance" standard, courts will enforce an administrative subpoena issued in aid of an investigation if: "(1) the subpoena is within the statutory authority of the agency; (2) the information sought is reasonably relevant to the inquiry; and (3) the demand is not unreasonably broad or burdensome." United States v. Zadeh, 820 F.3d at 755, citing United States v. Transocean Deepwater Drilling, Inc., 767 F.3d 485, 488 (5th Cir. 2014).

Relevant to the present case, the investigation of epiandrosterone and 19-nor-DHEA are not within the statutory authority of the agency. These products are not listed as illegal, and there is no need to investigate lawful activity.

## B. United States v. Forbes, 806 F. Supp 232 (D. Colo. 1992)

This case arose from a DEA/DOJ effort to prosecute a substance called Alpha-Ethyltryptamine (AET) under the Controlled Substance Analogue Enforcement Act. AET was not a controlled substance listed in the CSA schedules. However, the government believed AET was an illicit "analogue" of the hallucinogen DMT (a Schedule I drug) because of some chemical similarity. In 1992, federal prosecutors issued charges (essentially treating AET as an illegal controlled substance) after it was found being distributed for human use. This was the first federal prosecution targeting AET as a controlled-substance analogue.

The defendants moved to dismiss the indictment, arguing that AET was a legal product not covered by the CSA. They pointed out that AET was actually an old antidepressant developed in the 1960s and, even after it was withdrawn for side effects, it remained available for purchase without any restriction from chemical suppliers. In other words, it was legally obtainable and not banned by law. The defense also marshaled expert evidence that AET's chemical structure and effects were not substantially similar to DMT or any controlled substance, meaning it did not meet the definition of a "controlled substance analogue." They argued that the analogue statute was unconstitutionally vague if applied to AET, given the lack of scientific consensus that AET mimics a controlled drug.

The U.S. District Court in Colorado agreed with the defendants and quashed the DEA's enforcement action by dismissing the case. The court was persuaded that AET was not clearly an illegal analogue. Notably, even DEA's own chemists were divided on whether AET was substantially similar to DMT – a 1990 DEA memorandum had acknowledged "a great diversity of opinion" on whether AET should be considered a controlled analogue. The judge found that AET's

legal status was too ambiguous: it was openly sold by legitimate companies and experts could not concur on its effects or structure. Given this uncertainty, the court ruled that using the analogue law to prosecute AET violated due process (void-for-vagueness) because ordinary people wouldn't have fair notice that AET was illegal. The defendants' motion to dismiss was granted, and the indictment was thrown out, relieving them of any obligation to comply with the DEA's investigative demands regarding AET.

Forbes was one of the earliest cases to check the DEA's reach over substances not explicitly controlled. It established that if a product is not scheduled and its status as an analogue is debatable, courts may refuse to enforce the CSA against it. In practical terms, this case set a precedent (at least at the trial court level) that the DEA cannot stretch its subpoena or enforcement power to a substance that falls in a legal gray area without clear evidence of illegality. The ruling warned that the DEA's analogue authority has limits – when a product is legally sold and scientific opinion varies, the agency cannot simply declare it illegal via prosecution. This precedent has influenced later cases and DEA practices, ensuring that legal substances (or those not clearly prohibited) are not subject to unwarranted DEA subpoenas or criminal charges without solid statutory grounds.

[T]he term "controlled substance analogue" in § 813 is clearly and specifically defined.... It provides adequate notice of what conduct is prohibited. The statute makes plain that drugs *which have been <u>chemically designed to be similar</u> to controlled substances*, but which are not themselves listed on the controlled substance schedules, will nonetheless be considered as different schedules substances. In § 802(41)(A), the term "anabolic steroid" means any drug or hormonal substance, chemically and pharmacologically related to **testosterone** (other than estrogens, progestins, corticosteroids, and **dehydroepiandrosterone**). Here, the following list of chemical

-7-

structures shows that epiandrosterone and 19-nor-DHEA show dissimilarities with testosterone, while they clearly show similarities with dehydroepiandrosterone (DHEA).



*Figure 1. Dehydroepiandrosterone (DHEA)*

*(See **Exhibit "C"** for carbon positions of this substance)*



*Figure 2. Epiandrosterone*

*(See **Exhibit "C"** for carbon positions of this substance)*



*Figure 3. 19-Nor-DHEA*

*(See Exhibit "C" for carbon positions of this substance)*



*Figure 4. Testosterone*

*(See Exhibit "C" for carbon positions of this substance)*

In figure 1, 2, and 3, the chemical structure of DHEA, epiandrosterone, and 19-nor-DHEA clearly shows that the functional group ketone (C=O) at position carbon 17 and hydroxyl (-OH) at position carbon 3. In contrast, testosterone has these groups **swapped** – see figure 4. The chemical structure of testosterone clearly shows that the functional group ketone (C=O) at position carbon 3 and hydroxy (-OH) at position carbon 17, which makes their structures VERY DIFFERENT in terms of their functional groups' position. Even though both groups of compounds share the similar four-ring core structure, the placement of the ketone and hydroxyl groups makes DHEA and its derivatives chemically and pharmacologically distinct from testosterone. Checking the functional groups and their positions is one of the most common ways to determine the similarity between

chemical substances. Chemists often use this approach because the type and placement of functional groups largely dictate how a molecule reacts and behaves. Because of the differences in their functional groups, DHEA, epiandrosterone, and 19-nor-DHEA are **NEITHER** substantially similar in chemical structure **NOR** in pharmacological effect to testosterone; instead, they clearly belong to the DHEA family, as their distinct metabolic pathways and receptor interactions lack the potent anabolic and androgenic properties characteristic of testosterone, confirming that they are clearly **NOT** anabolic steroids.

### C. Hemp Industries Ass'n v. Drug Enforcement Administration, 357 F.3d 1012 (9th Cir. 2004)

DEA's failing to adhere to the legal framework and procedural safeguards set out in the Controlled Substances Act was not the only time happened in the food supplement industry. A coalition of hemp businesses challenged the DEA's subpoenas/rules, arguing that their hemp products were derived from parts of the cannabis plant expressly excluded from the federal definition of "marijuana". They contended these products were legal under the Controlled Substances Act (CSA) and that DEA lacked authority to prohibit them without formal scheduling. The court Ninth Circuit agreed with the hemp industry. The court noted that under the CSA, naturally occurring tetrahydrocannabinols (THC) is only illegal when it is contained in marijuana (defined as certain parts of the Cannabis plant), or when it is synthetic THC. Because the hemp seed and oil products did not fall under the CSA's definition of marijuana and contained only natural THC, they were not banned by existing law. The DEA's attempt to ban these legal products exceeded its authority. The court reiterated that DEA regulations can be enforced only insofar as they prohibit actual marijuana or synthetic THC—not legal hemp derivatives. It invalidated the DEA's rule, effectively quashing any enforcement (or subpoenas) aimed at those legal hemp foods. This case set a clear precedent that DEA's power does not extend to products explicitly made legal by the CSA's

definitions. It affirmed that parts of the cannabis plant excluded from the "marijuana" definition (e.g. hemp fiber, sterilized seed, oil) and products made from them are legal and beyond the DEA's enforcement reach absent a new law. In short, a substance lawfully outside the schedules (like epiandrosterone and 19-nor-DHEA) cannot be swept in by DEA via subpoena or rule. This ruling has been cited to prevent DEA from treating legal hemp products as controlled substances.

DHEA (dehydroepiandrosterone) and related products are naturally occurring hormones produced by the adrenal glands and have long been **available over the counter** (e.g. Amazon, Walmart etc.) due to several factors: as an endogenous hormone that serves as a precursor to androgens and estrogens, it supports hormone balance naturally; its classification as a dietary supplement in the United States exempts it from the stringent regulatory requirements imposed on pharmaceutical drugs, allowing it to be sold without a prescription; its decades-long market history and widespread use for potential improvements in energy, mood, and overall well-being have solidified its acceptance by consumers; and its legal status is reinforced by the fact that, being naturally produced and marketed as a supplement, it is not subject to the same controls as prescription hormones or anabolic steroids.

However, the DEA has requested a slew of irrelevant documents (See **Exhibit "B"** and as shown below) including things clearly overbroad and not relevant to their "investigation," especially so, where Respondent can clearly establish that he does not sell illegal substances as alleged. For example, the following was demanded in the subpoena:

- Domestic and foreign supplier list including company name, address, point of contact, telephone number, products purchased during the period 10/6/2021 to present.

**RESPONDENTS OBJECTION:** If the investigation is concerned with whether or not there is illegal activity, getting supplier list from 4 years ago to present does not help to determine the legality of the alleged substances.

– 11 –

- Instructions, formulas, commercial container labels provided by you or your company MegaMuscles to supplier-manufacturers for each order during the period 10/10/2022 to present.

**RESPONDENTS OBJECTION:** The labels can be found online and is equally accessible to the DEA. Formulas would be subject to trade secret protections and subject to a protective order, which was never offered. This request is also ambiguous and undefined since there is no term "supplier-manufacturers" and there is no importing of any alleged illegal substances. This vagueness renders compliance unreasonably burdensome, as it does not provide a clear standard for which records must be produced.

- Written explanation regarding how orders are placed with each supplier-manufacturer.

**RESPONDENTS OBJECTION:** This is not relevant to any legitimate investigation and is outside the agency's authority to demand. How orders are placed has nothing to do with the core issue of determining if Respondent is actually marketing/selling illegal steroids or not.

- All receiving records kept in the normal course of business for the order, purchase, and receipt of epiandrosterone, 7-keto DHEA and/or 19-nor DHEA products from manufacturers, or any other suppliers, during the period 10/10/2022 to present.

**RESPONDENTS OBJECTION:** It is not clear at all what a "receiving record" is. This was never defined by the DEA, while it could have easily done so. Thus, the request is overbroad.

- Domestic transportation records for epiandrosterone, 7-keto DHEA and/or 19-nor DHEA, in all forms, including raw material, finished product, and in-process material;

**RESPONDENTS OBJECTION:** It is not clear what the phrase "domestic transportation records" refers to or what "in-process material" is or what "raw material" means or refers to. These terms need to be more clearly defined and narrow in scope.

**RESPONDENTS OBJECTION:** Based on their chemically structural and pharmacologically functional equivalence to DHEA — a compound whose legal status is well-established — these substances are not subject to the restrictions or special regulatory treatment. Respectfully, without clarifying the connection between these compounds and the legal or regulatory at hand, it seems the DEA is engaged in a fishing expedition, and not a lawful investigation.

- Epiandrosterone, 7-keto DHEA, and/or 19-nor DHEA products commercial customer list, including customer name with any DBA, address, point of contact, telephone number, product name, commercial container size for products sold during the period 10/10/2022 to present (customers include any third parties that may sell epiandrosterone, 7-keto DHEA, and/or 19-nor DHEA products on your behalf, and any individual bulk customers);

**RESPONDENTS OBJECTION:** Customer lists and container sizes have no bearing on the issue of whether respondent is in violation of the law. It is important to note that there is NO REQUEST to understand or identify the chemical compounds or science at issue in this matter. Thus, this is not an investigation as to Respondent and he is unduly burdened to respond to these vague requests.

- For epiandrosterone, 7-keto DHEA and/or 19-nor DHEA products directly distributed or sold by your company online: a list of the website names, website addresses (URL), company name and any DBA associated with the website, and the address of the physical location from where products are distributed (sold and shipped, if different locations) to online customers.

**RESPONDENTS OBJECTION:** The bulk of this demand relates to publicly available information not proper for a subpoena. The DEA should already have all this information that is easily obtainable online, and thus, is irrelevant, and unduly burdensome to Respondent. The key to keep in mind, to determine whether or not this investigation is in fact legitimate, is that under the *Designer Anabolic Steroid Act* (which the DEA purports to rely on), this law looks to "a drug or other hormonal structure....that is derived from, or has a chemical structure "substantially similar" to a listed anabolic steroid, IF IT:

I. (a) was created or marketed with the intent or producing a substance that promotes

muscle growth, or (b) that causes a pharmacologic effect "similar" to testosterone, OR

II. Is marketed or promoted to promote muscle growth "similar" to testosterone.

Here, the DEA did not subpoena any compound information, **chemical analysis or** hormonal information, marketing information, or information or documentation regarding pharmacological effects, studies, or other documents Respondent may have relied on in developing its legal product. The issued subpoena **exceeds their authority**. More so as, it demanded compliance in California, while Respondent lives in Virginia. While the FRCP does not apply, the request alone was unreasonable and unduly burdensome in terms of time and travel. There were no grounds for issuance of the subpoena demanding compliance in California.

Based on the enforcement standard for administrative subpoenas, the documents requested must be relevant to the purpose of the investigation and the demand must be reasonable and not unduly broad or burdensome. *Viadero*, 123 F.3d at 329. A subpoena is not **unreasonably burdensome** unless compliance threatens **to unduly disrupt or seriously hinder normal operations of a business."** *FTC v. Jim Walter Corp.*, 651 F.2d 251, 258 (5th Cir. 1981). See *United States v. Zadeh* (N.D.Tex. Jan. 31, 2015, Civil Action No. 4:14-cv-106-O) 2015 U.S.Dist.LEXIS 11538, at *6.). (emphasis added).

Here, there is no question the subpoena sought to force Respondent to abandon his business and comply in California, based on a vaguely worded subpoena that sought nothing about marketing or actual compounds use to create the product.

The DEA's authority to issue administrative subpoenas is not unlimited. As established in *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950), an agency's subpoena power is confined to inquiries "*within the authority of the agency.*" The documents requested bear no reasonable relationship to any legitimate investigation into controlled substances as defined under

the Controlled Substances Act or the *Designer Anabolic Steroid Control Act of 2014 ("DASCA")*.

As the *U.S. v. Morton Salt* case noted:

> "The judicial subpoena power not only is subject to specific constitutional limitations, **which also apply to administrative orders**, such as those against self-incrimination, unreasonable search and seizure, and due process of law, but also is subject to those limitations inherent in the body that issues them because of the provisions of the Judiciary Article of the Constitution." (emphasis added).
>
> We must not disguise the fact that sometimes, especially early in the history of the federal administrative tribunal, the courts were persuaded to engraft judicial limitations upon the administrative process. **The courts could not go fishing, and so it followed neither could anyone else.** Administrative investigations fell before the colorful and nostalgic slogan "*no fishing expeditions.*" It must not be forgotten that the administrative process and its agencies are relative newcomers in the field of law and that it has taken and will continue to take experience and trial and error to fit this process into our system of judicature." (emphasis added).

See *United States v. Morton Salt Co.* (1950) 338 U.S. 632, 642 [70 S.Ct. 357, 363-364, 94 L.Ed. 401, 410].). Moreover, federal courts have rejected subpoenas on other grounds at issue in this case. For example, In *United States v. Golden Valley Elec. Ass'n* (9th Cir. 2012) 689 F.3d 1108, 1113.) the court held:

> "An administrative subpoena may not be "too indefinite or broad." *Peters v. United States*, 853 F.2d 692, 699 (9th Cir. 1988). "The critical questions are: (1) whether Congress has **granted the authority to investigate; (2) whether procedural requirements have been followed; and (3) whether the evidence is relevant and material to the investigation.**" *EEOC v. Children's Hosp. Med. Ctr. of N. Cal.*, 719 F.2d 1426, 1428 (9th Cir. 1983) (en banc), *overruled on other grounds as recognized in Prudential Ins. Co. of Am. v. Lai*, 42 F.3d 1299 (9th Cir. 1994). Even if other criteria are satisfied, "a Fourth Amendment **'reasonableness' inquiry** must also be satisfied." *See Reich v. Mont. Sulphur & Chem. Co.*, 32 F.3d 440, 444 n.5 (9th Cir. 1994). See *United States v. Golden Valley Elec. Ass'n* (9th Cir. 2012) 689 F.3d 1108, 1113.) (emphasis added).

Here the demands are **not** relevant or material and are NOT seeking to get at the *heart of the matter* of whether Respondent is violating federal statutory law. For the reasons set forth above, it appears that this DEA's investigation is based on a **fundamental misunderstanding of the legal status and scientific properties of these compounds**. To further their fishing expedition, they

seek to unduly burden Respondent and violate his rights. The Subpoena should be quashed since it is overbroad and reaches beyond what the DEA is authorized to request, it is invalid, and the respondent is not obligated to comply when the investigative demands go too far by targeting legal products or by failing to follow proper scheduling procedures. Other cases bear on this objection. Upon petitioning for enforcement of an administrative subpoena, **the issuing agency must make a <u>threshold showing</u> that the subpoena is within the agency's authority, that the agency has satisfied statutory requirements of due process, and that the information sought is <u>relevant and material</u> to the investigation.** See *EEOC v. Children's Hospital Medical Center*, 719 F.2d 1426, 1428 (9th Cir. 1983) (en banc); *see United States v. Powell*, 379 U.S. 48, 57-58, 13 L. Ed. 2d 112, 85 S. Ct. 248 (1964). (emphasis added). Here, the subpoena forcing client, a Virginia resident, to appear in California to address concerns related to a vague and ambiguous subpoena, that fails to address the heart of the matter appear to be no more than an attempt to waste his time and disrupt his business for no lawful purpose.

III. **Conclusion**

For the reasons stated herein, respondent should not be compelled to respond to the DEA subpoena, and the court should discharge the order to show cause.

Respectfully Submitted,

DATED: March 20, 2025

/s/ Mr. Siu Lim Lee
In Pro Per
Respondent
